**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE MICHAELS STORES PIN PAD LITIGATION | Case No. 1:11-cv-03350 |
| | <u>CLASS ACTION</u> |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | Honorable Thomas M. Durkin |
| This Documents Relates to All Actions | |

**DECLARATION OF JOSEPH I. MARCHESE IN SUPPORT OF CLASS COUNSEL'S
MOTION FOR FINAL APPROVAL OF SETTLEMENT AND FOR AN AWARD OF
ATTORNEYS' FEES, COSTS AND EXPENSES, AND CLASS REPRESENTATIVE
INCENTIVE AWARDS**

I, Joseph I. Marchese, declare as follows:

1.      I am an attorney duly licensed to practice before the courts of the State of New York, and I am admitted *pro hac vice* in this Court.  I am a partner of Scott Bursor at Bursor & Fisher, P.A., one of the Co-Lead Settlement Class Counsel appointed by this Court in its December 19, 2012 Order preliminarily approving the proposed settlement of this litigation (the "Settlement").

2.      I actively participated in all aspects of this action, including negotiation of the settlement, and am fully familiar with the proceedings being resolved.  If called upon, I am competent to testify that the following facts are true and correct to the best of my knowledge, information, and belief.

3.      I submit this declaration in support of Class Counsel's motion for Final Approval of Settlement and For an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Class Representative Incentive Awards.

4.      As set forth below, through plaintiffs' diligent prosecution of the cases in this

Court, plaintiffs reached a significant global settlement with defendant Michaels. Plaintiffs' counsel respectfully submit that the Settlement is fair, reasonable, adequate, and in the best interests of all Class members, and therefore should be approved by the Court.

5.     I believe that plaintiffs could not have obtained more in the Settlement. A broad and complex range of both legal and factual issues presented themselves during the course of prosecuting this litigation. Plaintiffs' counsel analyzed these issues and concluded that, while the litigation possessed merit, there was substantial risk in proving and obtaining any substantial recovery on behalf of any portion of the putative plaintiff class. Despite these constraints, plaintiffs' counsel confronted these issues aggressively in their ongoing investigation, subsequent litigation, and settlement negotiations.

6.     This declaration generally sets forth the facts of this action resulting in the Settlement, the factors considered in agreeing to the Settlement, and an explanation of the terms of the Settlement. While not all-inclusive, this declaration is intended to provide the Court with the history, scope, risk, and complexity of the litigation. Moreover, this declaration summarizes the work performed by Grant & Eisenhofer, P.A., Bursor & Fisher, P.A., and Faruqi & Faruqi, LLP (collectively, "Class Counsel"), as well as other law firms that have performed work at the direction of Class Counsel. As demonstrated below, Class Counsel have taken the primary role in performing and coordinating all manner of tasks related to this matter at each phase of the litigation, including initial case investigation, filing of complaints, merits discovery, motion practice, settlement negotiation, motions for settlement approval and dissemination of notice to the Class members. During the course of this litigation, Class Counsel have supervised and directed the work performed by Co-Counsel to ensure maximum efficiency. I have personally gained an intimate understanding of the case and believe that the Settlement achieved on behalf

of the Class meets and exceeds the "fair, adequate, and reasonable" standard required for the Court's approval.

7.      Class Counsel has dedicated significant time and resources to litigating this case on behalf of the Class.  Their legal services were performed on a wholly contingent fee basis. Therefore, Class Counsel and Co-Counsel have assumed the risk of non-payment in litigating and prosecuting this action and have at all times ensured that sufficient resources were made available.

8.      Among other things, to achieve this Settlement, Class Counsel took the following litigation actions:  (1) conducted an extensive pre-suit investigation that laid the groundwork for a strong Consolidated Amended Class Action Complaint ("CACAC"); (2) self-organized and coordinated their combined legal talents for the benefit of the Settlement Class; (3) retained a prominent information assurance and forensic computing consulting firm, for consultation, advice, and litigation support concerning the consolidated actions; (4) proposed a 27-point list of meaningful PIN pad security and policy measures that Michaels should implement for the benefit of the Settlement Class; (5) filed an comprehensive CACAC that survived Michaels' motion to dismiss, which Class Counsel opposed with a thoroughly researched memorandum in opposition; (6) moved for class certification on behalf of the proposed class; (7) engaged in a full-day mediation with defense counsel before the late Judge Nicholas Politan; (8) conducted a Rule 26(f) conference, exchanged initial disclosures with defense counsel and filed a joint proposed case management order with the Court; (9) served formal document requests, interrogatories and a notice of Rule 30(b)(6) deposition on Michaels; (10) participated in numerous, spirited settlement negotiation conferences with defense counsel; (11) reviewed confirmatory discovery from Michaels in furtherance of the Settlement; and (12) fielded telephone calls from Settlement

Class Members who were inquiring about the Settlement. As is the case in nearly all complex class actions, the volume of work required the efforts of multiple firms. Although a number of individuals contributed to this matter, each attorney or paralegal was careful to minimize or avoid the duplication of any work.

9.     As set forth below, through plaintiffs' diligent prosecution of the cases in this Court (collectively, the "Actions"), Plaintiffs reached a significant global settlement with defendant Michaels Stores, Inc. ("Michaels"), which provides for: (i) non-reversionary fund of $600,000, which provides cash relief for unreimbursed out-of pocket monetary losses or fees sustained in connection with the Compromise; (ii) up to four years of three-bureau credit monitoring services having a market value of approximately $170 per annum per Settlement Class member; and (iii) verification of remedial and prophylactic measures Michaels has taken to confirm containment of the Compromise that gave rise to this litigation and to strengthen PIN Pad security for Settlement Class Members who choose to continue shopping at Michaels since the Compromise. Also, Michaels will contribute an extra $200,000 to the settlement fund if the total payment of valid claims would cause the total payments from the fund to exceed the initial $600,000 contribution, thereby increasing the total amount of the fund to $800,000. Plaintiffs' counsel are very proud of the Settlement and respectfully submit that the settlement is fair, reasonable, adequate, and in the best interests of all Class members, and therefore should be approved by the Court. After extensive notice of the Settlement, not a single objection was filed.

10.     In recognition of the substantial efforts by plaintiffs' counsel and the benefits achieved for the Class through this Settlement, Class Counsel request that the Court approve payment of an award of $1,200,000 in attorneys' fees plus reimbursement of litigation costs and expenses. Michaels has agreed to pay this amount, subject to Court approval. This amount is

fair to both the Settlement Class and plaintiffs' counsel and warrants Court approval. The fee request is within the range of fees customarily awarded in similar actions and is justified in light of the substantial benefit conferred on the Settlement Class, the risks undertaken, and the quality and extent of the services performed, as set forth herein and in the Fee Application.

11. To achieve this result, Class Counsel worked over 1667.65 hours, for a total lodestar of $944,606. These hours were recorded in a manner consistent with accepted practices related to contemporaneous time and billing procedures. By proceeding with this case on a contingent fee basis, Class Counsel and Co-Counsel were incentivized to conduct our work as efficiently as possible.

12. This requested fee amounts to a nominal multiplier of 1.27 on total lodestar.

13. Moreover, this payment was negotiated only after the parties had agreed to all other salient aspects of the Settlement. This procedure is in accordance with the MANUAL FOR COMPLEX LITIGATION, THIRD § 30.42 (Fed. Judicial Ctr. 1995), which states: "Separate negotiation of the class settlement before an agreement on fees is generally preferable to avoid conflicts of interest between the attorneys and their clients[.]" Thus, the issue of fees did not cloud other aspects of the negotiation. The fee-and-expense payment was structured so as not to reduce any of the settlement benefits being provided to Class members.

14. Based upon my experience in complex consumer class action litigation similar to this case, it is my opinion that the attorneys performing work here maintain and bill at hourly rates that are correlated to their respective experience and which are reasonable.

15. Class Counsel also seeks reimbursement of out-of-pocket litigation costs and expenses that were advanced and carried by Class Counsel. This declaration summarizes these total litigation costs and expenses, totaling $55,565.46, incurred by Class Counsel. In the same

manner that Class Counsel were incentivized to conduct work as efficiently as possible, so too were we incentivized to be extremely judicious in our approach to expending funds.

16. Finally, Class Counsel seek incentive awards for the 10 Class Representatives in the amount of $2,500 each. I believe that such an award is warranted here for their monitoring and/or overseeing the prosecution of the litigation, consulting with counsel frequently, providing and reviewing a wide variety of relevant documents, and offering input and direction at critical junctures.

17. Class Counsel have achieved what I believe is an excellent settlement. In the Settlement, plaintiffs achieved much of the relief that they initially sought. Such a settlement is a reflection of the dedication and professionalism of the parties and their counsel.

## I. OVERVIEW OF THE LITIGATION

### A. Commencement Of The Cases

18. In early May of 2011, plaintiffs firms representing customers of Michaels began researching reports of data security breaches after Michaels reported that PIN pad tampering may have occurred in its Chicago area stores. Michaels later revealed that between February 8, 2011, and May 6, 2011, skimmers placed approximately ninety tampered PIN pads in eighty Michaels stores across twenty states.

19. Prior to filing a lawsuit against Michaels, my law firm conducted an extensive pre-suit investigation. As part of our pre-suit investigation, we interviewed numerous class members and reviewed their bank statements and other financial statements; researched the nature and extent of the security breach at Michaels; researched the criminal scheme known as "skimming;" researched the workings of PIN pad payment processing equipment; researched industry standard security measures for guarding against "skimmers;" and investigated Michaels' response to the security breach.

20.     I was responsible for developing the legal theories in the first-filed complaint in *Ramundo v. Michaels Stores, Inc.*, Case No. 11-cv-3350 (N.D. Ill.), and I was the principal drafter of the complaint, with assistance and input from my partner, Mr. Bursor.

21.     Prior to filing the complaint, my firm retained Mark D. Belongia of Belongia Shapiro & Franklin LLP as local counsel for this matter.

22.     On May 18, 2011, my law firm filed an action in the United States District Court for the Northern District of Illinois on behalf of Brandi Ramundo, naming Michaels Stores, Inc. as the defendant.  The complaint alleged that Michaels failed to employ commercially reasonable security measures to protect customers' personal financial data, including credit and debit card information and PIN numbers.  The Ramundo complaint further alleged that Michaels' failure to secure its customers' debit and credit card information led to a security breach that exposed the personal and financial data of customers who shopped at over 80 Michaels stores across 20 states between February 8, 2011 and May 6, 2011.  Customers' financial information was exposed and disseminated in a data breach perpetrated by third-parties who tampered with Michaels' in-store PIN pads to "skim" unwitting customers' financial information and subsequently steal money directly from the victims' bank accounts from remote automated teller machines.  "Skimming" is the unauthorized capture of debit and/or credit card magnetic strip data.  Finally, the complaint alleged that Michaels did not pursue commercially reasonable measures to notify its customers about the security breach, and it failed to provide timely and clear notice to anyone, thereby preventing customers from taking meaningful steps to secure their own data and bank accounts.

23.     Plaintiff Ramundo asserted claims against Michaels including claims for violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1, et seq. and breach of implied contract, among others.

**B.      Class Counsel's Coordination And Private Ordering**

24.     Shortly after filing the Ramundo action, my partner, Mr. Bursor, was contacted by Antonio Vozzolo, a partner at Faruqi & Faruqi, LLP (the "Faruqi firm").  Mr. Vozzolo informed us that his law firm had been investigating the Michaels data breach and was going to file another class action case in the Northern District of Illinois.  On May 27, 2011, the Faruqi firm filed *Allen v. Michaels Stores, Inc.*, Case No. 11-cv-3579 (N.D. Ill.).

25.     Shortly after being contacted by Mr. Vozzolo, Mr. Bursor, was also contacted by Adam Levitt, at that time a partner at Wolf Haldenstein Adler Freeman & Herz LLC ("Wolf Haldenstein").  Mr. Levitt informed us that he had also been investigating the Michaels data breach and was also going to file a class action case in the Northern District of Illinois.  On June 1, 2011, Wolf Haldenstein filed *Siprut v. Michaels Stores, Inc.*, Case No. 11-cv-3725 (N.D. Ill.).

26.     My law firm had worked previously with Mr. Vozzolo and the Faruqi firm, but we had not worked previously with Mr. Levitt and Wolf Haldenstein.  Ultimately, lawyers from the three firms had an open and productive dialogue about each firm's work to date, their clients, and how to work cooperatively to advance the case on the merits as quickly and efficiently as possible.  As a result, Mr. Bursor, Mr. Vozzolo and Mr. Levitt agreed to work together to litigate their cases.

27.     On June 3, 2011, counsel for plaintiffs Ramundo, Allen and Siprut filed a motion to relate, reassign and consolidate the three cases and any subsequently filed or transferred cases sharing common questions of law or fact.  Also on June 3, 2011, plaintiffs' counsel filed a motion for appointment of interim class counsel.  On June 8, 2011, this Court granted both motions, consolidated the cases under the caption *In re Michaels Stores PIN Pad Litigation*, Case No. 1:11-cv-3350 ("*In re Michaels*"), and appointed Mssrs. Bursor, Vozzolo and Levitt as Interim Class Counsel.

28.     Shortly thereafter, on June 15, 2011, Class Counsel retained a prominent information assurance and forensic computing consulting firm, for consultation, advice and litigation support concerning the consolidated Actions.

### C.     Press Coverage Of The Allen Case Leads To The Filing Of Three Additional Actions

29.     On May 31, 2011, www.consumerist.com, a website widely read by members of the plaintiffs' bar, published an on-line article about the *Allen* action entitled, "Michaels Hit With Possible Class-Action Suit Over Data Breach."

30.     On June 1, 2011, www.findlaw.com, another website widely read by members of the plaintiffs' bar, also published an on-line article about the *Allen* action entitled, "Michaels Credit Card Lawsuit Filed Over Data Breach."  The FindLaw article references an earlier article about the *Allen* case reported by the Chicago Tribune.

31.     Two days later, on June 3, 2011, www.topclassactions.com, yet another website widely read by members of the plaintiffs' bar, also published an on-line article about the *Allen* action entitled, "Michaels Stores Hit with Second Class Action Lawsuit."

32.     On June 7, 2011, the law firm of Edelman, Combs, Latturner & Goodwin filed *Williams v. Michaels Stores, Inc.*, Case No. 11-cv-3883, in the Northern District of Illinois asserting class claims similar to those in *In re Michaels*.  On June 14, 2011, the Court entered an Order relating, reassigning and consolidating *Williams* into *In re Michaels*.

33.      On June 30, 2011, the law firm of Lite DePalma Greenberg, LLC filed *Rosenfeld, et al. v. Michaels Stores, Inc.*, Case No. 11-cv-6335, in the District of New Jersey asserting class claims similar to those in *In re Michaels*.  The *Rosenfeld* action was later transferred to this Court pursuant to defendant's unopposed motion to transfer pursuant to 28 U.S.C. § 1404.

34.     On August 10, 2011, the law firm of Disabato & Bouckenooghe LLC filed *Wilson v. Michaels Stores, Inc.*, Case No. 11-cv-5210, in the District of New Jersey asserting class claims similar to those in *In re Michaels*.  On October 12, 2011, Michaels filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to transfer the *Wilson* case to this Court, and Interim Class Counsel filed a joinder to Michaels' motion on November 3, 2011. *See* MDL No. 2312.  On February 7, 2012, the JPML denied Michaels' motion to transfer after holding oral argument.  The *Wilson* action was later transferred to this Court pursuant to defendant's unopposed motion to transfer pursuant to 28 U.S.C. § 1404.

35.     On August 25, 2011, the law firm of Sweetnam LLC filed *Sherry v. Michaels Stores, Inc.*, Case No. 11-cv-5900, in the Northern District of Illinois asserting class claims similar to those in *In re Michaels*.

36.     On September 26, 2011, Michaels filed a motion to relate and consolidate the *Sherry* and *Rosenfeld* actions into *In re Michaels*.  On September 29, 2011, the Court granted the motion to relate, reassign and consolidate *Sherry* and *Rosenfeld* into *In re Michaels*.

37.     On March 22, 2012, Michaels filed a motion to relate and consolidate the *Wilson* action into *In re Michaels*.  On March 28, 2012, the Court granted the motion to relate, reassign and consolidate *Wilson* into *In re Michaels*.

**D.     Class Counsel's Litigation Efforts**

38.     Class Counsel aggressively litigated the consolidated Actions on behalf of the proposed class.

39.     After the filing of their respective Actions, Class Counsel continued their zealous investigation into the facts and law relating to the matters alleged in consolidated proceeding. These investigations included inspection of Michaels' stores, consultation with industry

personnel, extensive consultation with experts, numerous interviews of witnesses and putative members of the Class, as well as legal research as to the sufficiency of the claims.

40.    On June 24, 2011, Class Counsel sent a letter to Michaels to propose a 27-point list of meaningful PIN pad security and policy measures that Michaels should implement for the benefit of the putative class.  The letter also suggested scheduling a meeting between Michaels' senior security personnel and plaintiffs' data security consultants to discuss the proposed security and policy measures and their implementation.

41.    On July 8, 2011, Class Counsel filed a Consolidated Amended Class Action Complaint ("CACAC") in this Court on behalf of plaintiffs Mary Allen, Kelly M. Maucieri, Brandi Ramundo and Adrianna Sierra against defendant Michaels Stores, Inc.  The CACAC alleged that Michaels failed to adequately secure its customers' personal financial information in violation of its contractual obligations to comply with the security requirements of Visa and other payment card companies.  It further alleged that Michaels failed to provide clear, conspicuous and timely notice to the putative class that their personal financial data had been breached and disseminated.  The CACAC asserted statutory claims for Michaels' violation of the Federal Stored Communications Act, 18 U.S.C. § 2702; and the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILL. COMP. STAT. 505/2, and common law claims of negligence, negligence per se, and breach of implied contract.

42.    On August 8, 2011, Michaels filed a motion to dismiss the CACAC pursuant to Federal Rule of Civil Procedure 12(b)(6).  On September 9, 2011, with permission from the Court, Class Counsel filed plaintiffs' overlength memorandum of law in opposition to Michaels' motion to dismiss.  Michaels filed its reply brief on September 23, 2011.  Pursuant to the Court's

September 13, 2011 Minute Order (Dkt. No. 42), Class Counsel filed a 10-page summary of plaintiffs' memorandum of law in opposition to defendant's motion to dismiss.

43.     On October 24, 2011, Class Counsel filed a motion for leave to file supplemental authority in further support of Plaintiffs' opposition to Michaels' motion to dismiss, namely the October 20, 2011 decision issued by the United States Court of Appeals for the *First Circuit in Anderson v. Hannaford Bros. Co.*, 659 F.3d 151 (1st Cir. 2011). The First Circuit's opinion in *Hannaford* confirmed that where a criminal operation deliberately took credit and debit card information from a merchant, and there was actual misuse of that information—that is, the precise factual circumstance alleged in the CACAC—the card holders' claims for the costs of purchasing identity theft insurance and credit monitoring are recoverable as mitigation damages under both contract and tort theories of liability. *See Hannaford*, 659 F.3d at 162-67. The Court granted Plaintiff's motion for leave to file supplemental authority on October 27, 2011.

44.     On November 23, 2011, the Court granted in part and denied in part Michaels' motion to dismiss. More specifically, the Court dismissed plaintiffs' Stored Communications Act claim and negligence claims, but upheld plaintiffs' claims pursuant to the Illinois Consumer Fraud and Deceptive Practices Act and for breach of implied contract. Notably, the Court found the First Circuit's reasoning in *Hannaford* to be "persuasive" in upholding plaintiffs' claim for breach of implied contract. (Dkt. No. 56 at p. 23).

45.     Also on November 23, 2011, Class Counsel filed Plaintiff's Motion for Class Certification in light of the Seventh Circuit's November 18, 2011 opinion in *Damasco v. Clearwire Corp.*, No. 10-3934, 2011 U.S. App. LEXIS 23093.

E.    **Initial Settlement Efforts – Mediation with Judge Nicholas Politan**

46.    On December 12, 2011, Class Counsel convened a teleconference with counsel for Michaels to discuss the possibility of working together to resolve these Actions through mediation.  After several conversations and e-mail correspondence, the parties agreed to a one-day mediation with the Hon. Nicholas H. Politan on February 8, 2012.

47.    In preparation for the mediation, Class Counsel submitted plaintiffs' confidential mediation statement to Judge Politan on January 31, 2012.

48.    On February 8, 2012, I attended the mediation with Class Counsel on behalf of the plaintiffs.  The mediation lasted for approximately nine hours.  The parties made substantial progress toward resolving their differences, but did not arrive at a final agreement that day. Despite failing to reach a deal at the mediation, the parties agreed to continue to work with Judge Politan to try to finalize a settlement.

49.    The parties' settlement efforts were slowed due to the unexpected death of Judge Politan later in February, 2012.

50.    Throughout March, 2012, counsel for the parties resumed their efforts at early resolution by engaging in numerous all-hands settlement conference calls and by exchanging language for settlement terms.  That said, the parties were still unable to agree on several settlement terms to finalize an agreement.

F.    **Initial Discovery Efforts Lead To More Settlement Negotiation And The Proposed Settlement**

51.    Pursuant to Federal Rule of Civil Procedure 26(f), a status hearing and meeting of the parties were held on April 19, 2012 in this Court.  Mr. Levitt appeared on behalf of plaintiffs. On May 7, 2012, the parties exchanged Rule 26(a)(1) initial disclosures, and Class Counsel served plaintiffs' amended initial disclosures on May 18, 2012.  Thereafter, on May 22, 2012, the

parties filed a joint proposed case management order, complete with a schedule for an initial discovery period beginning May 24, 2012. The Court adopted the parties' case management order on May 24, 2012.

52. On May 24, 2012, counsel for Michaels sent a letter to Class Counsel asking to schedule the depositions of every named plaintiff in August, 2012.

53. On June 20, 2012, Class Counsel served plaintiffs' first set of written discovery requests on Michaels, including document requests, interrogatories and a notice of a Rule 30(b)(6) deposition.

54. By late June, 2012, settlement talks between the parties resumed.

55. From June, 2012 into December, 2012, Class Counsel engaged in regular communications with counsel for Michaels about settlement. After these six months of negotiation, the parties reached a final settlement agreement on December 7, 2012. Prior to executing the Settlement Agreement, Class Counsel reviewed confirmatory discovery from Michaels in furtherance of the settlement.

**G. Preliminary Approval Of The Settlement**

56. On December 19, 2012, plaintiffs moved, pursuant to Fed. R. Civ. P. 23(e), for entry of an Order preliminarily approving the Settlement, provisionally certifying a nationwide settlement class; and approving a procedure for the form of Notice.

57. On December 19, 2012, this Court entered an Order granting Preliminary Approval of the Settlement, provisionally Certifying a nationwide Settlement Class, approving procedure for and forms of notice. This Court based its Preliminary Approval Order upon a preliminary examination that the Settlement "is sufficiently within the range of reasonableness to warrant the conditional certification of the Settlement Class, the scheduling of the Fairness Hearing, and the circulation of the Settlement Notice to the Settlement Class" as further provided

14

ion the Preliminary Approval Order. Additionally, this Court found that Settlement Class satisfied the perquisites of Fed. R. Civ. P. 23(a) and the requirements of Fed. R. Civ. P. 23(b)(3), in "that common issues predominate and that a class action is superior to other available methods for the fair and efficient resolution of this controversy." The Court further approved the form and method of notice set forth in the Settlement Agreement. To facilitate service of notice, this Court also appointed the Epiq System, Inc. ("Epiq") as Settlement Administrator for this Settlement and charged them with fulfilling all of the duties of the Settlement Administrator set forth in the Stipulation.

58.     On December 14, 2012, defense counsel for Michaels notified the Attorney General of the United States and the attorney general of each state where Settlement Class Members reside in accordance with the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715(b). (Dkt. 87).

59.     The proposed Class Action Settlement Agreement contains various representations from Michaels about actions it has taken to confirm containment of the Compromise and strengthen PIN Pad security for Settlement Class Members who continue to shop at Michaels since the data breach, and it creates a settlement fund of up to $800,000 for Settlement Class Member relief, including for reimbursement for unreimbursed out-of-pocket monetary loss from the data breach and for three-bureau credit monitoring services.

60.     The Settlement with Michaels is fair, adequate and reasonable. The Settlement takes into account the provable damages, the risks of the case and the delay likely in continued litigation. Class Counsel have extensive experience in prosecuting complex class actions and has obtained sufficient information to weigh the benefits of settlement. Class Counsel extensively analyzed the legal theories of the case, the risk, expense and delays of continued litigation and

determined the proposed compromise is fair under the circumstances. Defendant has vigorously denied any wrongdoing, and has raised legal and factual defenses to plaintiffs' allegations. Defendant raises, among other things, legal issues concerning proof of plaintiffs' injuries and actual damages, its liability under the statues asserted for the conduct alleged, and the admissibility of key evidence. Undoubtedly, Michaels would vigorously oppose class certification.

61. Subsequent to settling, Class Counsel was charged with drafting the Settlement Agreement and Notice Forms, as well as developing a notice plan, all of which were previously submitted to the Court with Plaintiffs' Motion for Preliminary Approval. The drafting of these documents and the design of the notice plan took significant time and effort on the part of Class Counsel and was part and parcel of Class Counsel's effort to achieve the greatest possible benefits for the Class.

62. On December 19, 2012, the Court entered an order preliminarily approving the Settlement and the notice plan proposed therein.

63. In the preliminary approval order, the Court approved of the proposed notice plan and directed the parties to provide the Settlement Class with notice of the Settlement. Class Counsel retained an experienced class action administrator, Epiq, to give notice of the Settlement to the members of the Settlement Class. The notice program consisted of a Summary Notice, which twice appeared in the nationwide publication USA Today. A settlement website was also made available at www.michaelsdatasettlement.com, and Michaels provided a link to the settlement website on the front page of www.michaels.com. Moreover, on January 14, 2013, Michaels started providing summary notice of the Settlement on customer receipts at the 86 affected stores. This notice language will be included on the store receipts through April 15,

2013.  Finally, starting on January 14, 2013, Michaels posted notice of the Settlement in the 86 affected stores.  The notice will remain posted through April 15, 2013 as well.

64.     On January 14, 2013, the Executive Committee of the United States District Court for the Northern District of Illinois ordered this Action be reassigned from Judge Kocoras to this Court for all further proceedings.

## II.   THE SETTLEMENT NEGOTIATIONS WERE ADVERSERIAL

65.     Class Counsel recognized from the outset that plaintiffs' case was complex and that various legal and factual hurdles needed to be overcome before any significant relief could be obtained for the Settlement Class Members.   The Settlement with Michaels was the result of arm's-length negotiations by counsel experienced in consumer class actions and other complex class action litigation, and was reached after numerous discussions with defense counsel.  At the time the parties agreed to the Settlement, Class Counsel were familiar with the facts, legal theories, and defenses relevant to plaintiffs' allegations.

66.     In connection with these settlement discussions, Class Counsel expended a significant amount of time preparing presentations in an effort to assist and facilitate the settlement process.

67.     Class Counsel undertook considerable legal and factual research, including extensive expert consultation and research regarding the nature and cause of the data breach, relating to plaintiffs' claims and defendant's defenses.  Plaintiffs' ongoing investigation and informal discovery conducted prior to and during the litigation were substantial, putting plaintiffs in an excellent position to accurately assess the strengths and weaknesses of their claims and defendant's defenses.

68.     During these negotiations, counsel for plaintiffs and for defendant presented, among other things, their respective views regarding the merits of the Actions including the

17

claims, defenses, and the damages sought in the Actions. To facilitate settlement negotiations, Class Counsel consulted extensively with our data breach security expert. As a result of these negotiations, the parties reached an agreement that they believe is fair and reasonable to the Settling Parties.

69.    However, even after an agreement was reached in principle, it took months to finalize negotiations and to iron out the specific language contained in the Settlement Agreement with defense counsel.

70.    Thus, settlement negotiations were difficult and intense from the outset. However, due to the persistent efforts of the parties, the named plaintiffs and their counsel eventually reached an agreement in principal, which was memorialized in the Stipulation, to settle the Actions for, among other remedies:  (i) non-reversionary fund of $600,000, which provides cash relief for unreimbursed out-of pocket monetary losses or fees sustained in connection with the Compromise; (ii)  up to four years of three-bureau credit monitoring services having a market value of approximately $170 per annum per Settlement Class member; and (iii) verification of remedial and prophylactic measures Michaels has taken to confirm containment of the Compromise that gave rise to this litigation and to strengthen PIN Pad security for Class members who choose to continue shopping at Michaels  since the Compromise.  Also, Michaels will contribute an extra $200,000 to the settlement fund if the total payment of valid claims would cause the total payments from the fund to exceed the initial $600,000 contribution, thereby increasing the total amount of the fund to $800,000.

71.    To preserve the Settlement Class's interests, Class Counsel took the position that any issues with respect to payment of attorneys' fees should be addressed only after the parties had reached agreement on other principal terms of the Settlement. The parties reached

conditional agreement on all other aspects of the Settlement before addressing attorneys' fees. Thus, in accordance with the duties owed to the Settlement Class, issues of attorneys' fees did not cloud any other aspect of the negotiation leading up to signing of the term sheet.

### III. THE SETTLEMENT CLASS SHOULD BE CERTIFIED

72. By Order dated December 19, 2012, the Court preliminarily certified the proposed Settlement Class only for Settlement purposes. Plaintiffs and Class Counsel now request that the Court finally certify the following Settlement Class:

> all customers who purchased items at a Michaels store location from January 1, 2011, to May 12, 2011, whose Payment Card was swiped on one of the Tampered PIN Pad Terminals.

> Excluded from the "Settlement Class," "Settlement Class Members," or "Class Members" are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors.

> Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff. Also excluded are any individuals or entities who "opt out" of the Settlement.

*See* Preliminary Approval Order, ¶ 3.

73. The Settlement Class satisfies the four requirements for class certification provided in Rule 23(a) of the Federal Rules of Civil Procedure: (a) the Settlement Class is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the Settlement Class Members; (c) the claims or defenses of the representative parties are typical of the claims of the Settlement Class; and (d) the representative parties will and have fairly and adequately protected the interests of the Settlement Class.

74. There are tens of thousands of potential Settlement Class Members. This makes the number of members of the proposed Settlement Class sufficiently large to make joinder impracticable. Therefore, the numerosity requirement is easily satisfied.

75. There are questions of law or fact common to the proposed Class. Fed. R. Civ. P.

23(a)(2). Commonality exists when there is either a common legal issue stemming from divergent factual predicates or a common nucleus of facts resulting in disparate legal remedies within the class. Here, there are common issues of law and fact, including whether Michaels' had standardized, nationwide PIN Pad data security practices and policies that affected the integrity and privacy of the PII of all Settlement Class members. Moreover, the adequacy, implementation and execution of Michaels' PIN Pad data security practices and policies, and the sufficiency of Michaels' efforts to notify Settlement Class Members of the security breach are issues common to all Settlement Class Members.

76.      The proposed Class Representatives' claims are typical of those of the Settlement Class. Fed. R. Civ. P. 23(a)(3). The proposed Class Representatives and the Settlement Class Members claims arise from the same security breach and related conduct by Michaels. Likewise, plaintiffs suffered the same alleged harm – unauthorized dissemination and misuse of their PII – and would receive the same relief as the other Settlement Class Members. Thus, the Class Representatives' claims are co-extensive with those of the absent Settlement Class Members.

77.      The proposed Class Representatives have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). First, plaintiffs have retained counsel who are qualified and experienced to litigate this action. The law firms representing the proposed Class have represented plaintiffs in numerous complex class actions over the past several decades, and are among the nation's most respected firms involved in complex litigation. *See* Vozzolo Decl., Ex. A (firm resume of the Faruqi firm), Levitt Decl., Ex. C (firm resume of Grant & Eisenhofer P.A.), and Marchese Decl., Ex. C (firm resume of Bursor & Fisher, P.A.).

78.      The diligent efforts of plaintiffs and Class Counsel to prosecute these Actions, as

described herein, demonstrate that plaintiffs and their counsel have more than adequately represented and acted to the benefit of the Class as a whole.   Second, the vigorousness of the litigation, as well as the length and difficult nature of the settlement negotiations, attest to the non-collusive nature of the Settlement.  Under the Settlement, all Class Members, including the proposed Class Representatives, will receive a free-of charge-repair or reimbursement for out-of-pocket expenses associated with repairing the affected models.

79.     This Settlement Class also satisfies Rule 23(b) requirements because: (a) there are common questions of law and fact which predominate over individual questions specific to Settlement Class Members, and (b) a class action is superior to other available methods for resolving this Litigation.

## IV.  THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

80.     Class Counsel believe that plaintiffs' cases have merit and that the Settlement embodied in the Settlement Agreement could not have been achieved without a thorough understanding of the facts and law supporting their claims.  Regardless, prosecution of these Actions was not without considerable risk.  After considering the burden of prevailing in court and the substantial additional effort, expense, risks of adverse rulings, and delays necessary to conduct trials on the merits in the Actions, and to resolve post-trial motions and inevitable subsequent appeals, Class Counsel believe that the Settlement is an excellent result for the Settlement Class in light of the benefits achieved.

81.     The relief obtained by Class Counsel in the Settlement Agreement is real and significantly beyond what Michaels would have done absent this litigation.  The Settlement represents an excellent achievement in the context of current laws and the substantial litigation risks that were faced (as is addressed next).  In short, the Settlement is fair, adequate and

reasonable and therefore warrants approval by the Court.

## V.  FACTORS SUPPORT THAT THE SETTLEMENT
## IS FAIR, REASONABLE AND ADEQUATE

82.     Plaintiffs faced a number of risks in bringing these actions and in obtaining relief
for the Settlement Class.  For example, some of the potential claims, both statutory and common
law, would have required plaintiffs to present their case primarily through the use of adverse
witnesses – e.g., Michaels employees with continued company loyalty.

83.     The existence of substantial risk cannot be demonstrated more clearly than by this
Court's partial granting of Michaels' motion to dismiss on November 21, 2011.  Additionally,
further prosecution of these Actions was not without considerable risk, which include among
other things, whether Michaels (a) entered into an implied contract with consumers concerning
the use of their PII; (b) complied with all data security standards; and (c) provided adequate
notice of the Compromise to Settlement Class Members in compliance with PIPA.  Another area
of significant risk is whether Michaels could be held liable to any Settlement Class Members
who have not suffered unreimbursed out-of-pocket expenses in connection with the
Compromise.  This is in addition to the risks inherent in the class certification motion and
uncertainties relating to liability and proof of compensable damages on a class-wide basis.

84.     As in all consumer actions, the existence and cause of the alleged security failures
that contributed to the Compromise would inevitably result in a battle of the experts, a battle that
can often be lost before the jury.  In this "battle of experts," it is virtually impossible to predict
with any certainty which testimony would be credited, and ultimately, which expert version of
causation would be accepted by a jury.  *Osburn v. Anchor Labs*., 825 F.2d 908, 916 (5th Cir.
1987).

85.     The subject matter of the Actions is also challenging.  It could be difficult for a

jury to properly understand and digest the complex technical information that plaintiffs would present at trial. This complexity also merits approval of the Settlement.

86.    The expense of continuing this litigation through trial would also have been quite substantial. Depositions of numerous Michaels employees, and ex-employees, (in diverse locations) would be needed. Class Counsel would need to rely even more extensively on consultants and experts, both in discovery and through trial. This additional expense would be considerable. Pursuant to the Settlement, the Settlement Class Members will benefit by receiving immediate, certain and substantial relief instead of waiting for a trial verdict that they have no guarantee of winning.

87.    In attempting to establish liability at trial, plaintiffs also faced the risks that (a) some or all of plaintiffs' witnesses would be unavailable at trial or would not testify as anticipated; (b) the jury would be more persuaded by Michaels' experts or misunderstand the expert testimony in a way favorable to Michaels; or (c) the jury would find some or all of the activities by Michaels were not actionable. If Michaels were successful in deflecting any of these claims, relief could be eliminated or substantially reduced. In addition, if Michaels were successful in convincing this Court that, once liability was established, each individual Settlement Class Member would need to prove a separate entitlement to damages (a position plaintiffs would dispute), trial of these specific damage issues would likely last for months.

88.    Class certification also poses inherent risks. As the Court is aware, a class was not yet certified in this case. While courts have held that consumer cases such as this one are suited for class treatment, securing class certification and maintaining it through trial is never a certainty. Therefore, the Settlement removes this issue as a potential obstacle.

89.    Plaintiffs believe that the risks detailed above would not have prevented recovery.

However, it would be imprudent to ignore the potential ramifications of some or all of these risks in determining the likelihood of establishing liability, damages, or entitlement to relief. In light of these factors, the Settlement obtained for the Class is an excellent result.

90.     Although plaintiffs believe their claims are meritorious, further litigation to establish liability poses a significant risk to any recovery for the Settlement Class. Assuming plaintiffs were to survive a motion for summary judgment, the risks of establishing liability posed by conflicting testimony and evidence would be exacerbated by the unpredictability of a lengthy and complex trial. In addition, even if plaintiffs were to prevail on the issue of liability, there would still be risks in establishing damages and the potential for appeals.

91.     The expertise and experience of Class Counsel and their views is another important factor to consider in assessing the reasonableness of this Settlement, including the payment of fees and costs as a separate and additional term in the Settlement Agreement. As indicated in the resumes attached to Class Counsel's declarations here, Class Counsel are experienced practitioners in both the consumer and defective product class action litigation field, responsible for significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted. It is the collective opinion of Class Counsel that the Settlement achieved is fair, adequate, and reasonable and should be approved by this Court.

## VI.   THE REACTION OF THE CLASS SUPPORTS APPROVAL

92.     Notice of this settlement has been widely disseminated, *see supra*, ¶ 63. Despite this breadth of notice, no objections were filed and only two requests for exclusion were received. In short, the reaction of the Settlement Class supports the reasonableness of this Settlement.

## VII.  THE AGREED FEE AND EXPENSE REQUEST IS REASONABLE

93.     Plaintiffs and their counsel seek an award of $1,200,000.00 in attorneys' fees plus reimbursement of their out-of-pocket expenses.  This award, as discussed in the accompanying memorandum of law in support of class counsel's attorneys' fees, costs and expenses, and incentive awards, is well within the range of fees commonly awarded based on both the "percentage-of-the-benefit" method, the lodestar method, or the combination of the methods as applied in similar class actions in this District, within this Circuit and throughout the United States.

94.     The requested fees are justified for all the reasons set forth herein and in the Fee Application, especially in light of the significant result obtained and the effort required.  The Court is also requested to consider that, despite the most vigorous and competent efforts of experienced class counsel, success in contingent class actions is never assured.  Lawyers who focus in complex contingent matters live in a world of uncertainty.  Unlike the defense bar, whose attorneys are paid regularly for each hour of service and are reimbursed on a current basis for expenses incurred, plaintiffs' contingency lawyers normally have no steady flow of income.  Moreover, as demonstrated recently, changes in the law through legislation or judicial decree can potentially be catastrophic and can adversely impact pending litigation.  The pecuniary losses suffered by plaintiffs' counsel in other actions, where insufficient settlement offers are rejected and plaintiffs' counsel receive little or no fee, should not be ignored in setting a fair fee.  This occurs in many hard-fought lawsuits where, because of discovery of facts unknown when the case commenced, or a significant change in the law during the pendency of the litigation, highly professional efforts of members of the plaintiff's bar produce no result for the class, and hence, no fee for counsel.

A.    **The Substantial Benefit Conferred Upon The Class Supports The Reasonableness Of The Requested Fee Award**

95.    In addition, the requested fee award recognizes the substantial benefit conferred by the creation of a (i) non-reversionary fund of $600,000, which provides cash relief for unreimbursed out-of pocket monetary losses or fees sustained in connection with the Compromise; (ii) up to four years of three-bureau credit monitoring services having a market value of approximately $170 per annum per Settlement Class Member; and (iii) verification of remedial and prophylactic measures Michaels has taken to confirm containment of the Compromise that gave rise to this litigation and to strengthen PIN Pad security for Class members who choose to continue shopping at Michaels since the Compromise.  Also, Michaels will contribute an extra $200,000 to the settlement fund if the total payment of valid claims would cause the total payments from the fund to exceed the initial $600,000 contribution, thereby increasing the total amount of the fund to $800,000.

96.    Despite the uncertainty associated with the litigation of complex consumer class actions, coupled with defendant's fervent denial of the allegations contained in plaintiffs' original and amended complaints, Class Counsel were able to obtain an extremely favorable Settlement.

B.    **The Time And Labor Expended Supports The Reasonableness Of The Requested Fee Award**

97.    This fee and expense award is entirely reasonable as compensation for the work performed on behalf of the Class members.  Class Counsel's compensation for the services rendered has been completely contingent.  As detailed above, the law firms making this application were unwavering in their dedication to the interests of the class and in their investment of the necessary time and resources to bring this matter to a successful conclusion.

26

To date, Class Counsel have invested 1667.65 hours of time with a resulting lodestar of $944,606.

98.    A total fee award of $1,200,000, represents a modest multiplier of approximately 1.27 applied to Class Counsel's lodestar.  This multiplier is well within the accepted range that courts apply in this District, in the Seventh Circuit, and elsewhere.

### C.    Attorneys' Fee Awards In Other Class Action Cases

99.    The Settlement, if approved, will provide Settlement Class Members with direct and immediate monetary reimbursement for unreimbursed out-of-pocket monetary losses or fees sustained in connection with the Compromise, and with up to four years of three-bureau credit monitoring services having a market value of approximately $170 per annum per Settlement Class Member.  The Settlement also provides additional benefits to the Settlement Class in the form of representations that Michaels has made to confirm containment of the Compromise and to improve PIN Pad security for Settlement Class Members

100.    While it is impossible to determine with absolute certainty the actual settlement value to the Settlement Class, an estimated potential market retail value of just one year of the credit monitoring relief alone approximates $16,150,000 (i.e. 95,000 Settlement Class Members multiplied by $170).  Based on these dollars, Class Counsel's fee request of $1,200,000 represents approximately 7.5% of the potential retail market value of the available settlement benefits from just one year of the credit monitoring service, which is a significantly smaller percentage than other attorneys' fee awards approved in other class actions by courts in this Circuit.

### D.    Agreement Between Plaintiffs And Their Counsel

101.    The client representation agreements between plaintiffs and Class Counsel provide for legal services to be provided on a contingent basis and to be determined by the Court.

E.     **The Risk Of Nonpayment**

102.     From the beginning, Class Counsel agreed to represent their clients on a contingency basis knowing that there was a real possibility that these cases could be litigated for years with no recovery for the time and effort expended in furtherance of the matter.

103.     If this matter were litigated to conclusion, plaintiffs would have to prevail at the class certification stage and then prove the merits of their case.  As evidenced by Michaels' motion to dismiss, the defendant had every intention of aggressively litigating this case from the start.  The possibility of settlement was at best uncertain at the outset of this matter, and it remained uncertain after Michaels' motion to dismiss was denied.  Only after additional litigation, including service of formal discovery, and after many months of good faith, arm's length negotiations did this Settlement take shape.

F.     **The Quality Of Class Counsel's Performance**

104.     The experience, reputation, and ability of plaintiffs' counsel are also important factors in assessing the adequacy of a settlement and in setting a fair fee.  The expertise of Class Counsel is substantial.  Class Counsel are experienced and skilled practitioners in the field of complex class action litigation.  The expertise and experience of Class Counsel is described in detail in the firm resumes attached as exhibits to their declarations.

105.     The quality of the work performed by Class Counsel in attaining the Settlement may also be evaluated, in part, in light of the quality of the opposition.  Michaels was represented by Hunton & Williams, a firm well known for its skilled and professional representation of its clients, including in data breach cases.  In the face of this high caliber opposition, Class Counsel vigorously pursued the Actions and achieved a significant award for the Settlement Class Members.

## VIII.   BURSOR & FISHER'S LODESTAR AND EXPENSES

106.    From the outset of this litigation, Class Counsel have faced significant opposition from Michaels and from other plaintiffs' lawyers.  Through our perseverance, cooperation and hard work, we have overcome the obstacles and obtained a fair Settlement for the Class that was negotiated at arm's-length.

107.    This declaration goes on to describe the lodestar fees and expenses for Bursor & Fisher, P.A.  The fees and expenses for the other counsel will be described in separate declarations from those firms, submitted herewith.

108.    Through January 31, 2013, Bursor & Fisher expended 488.1 hours in this case. Bursor & Fisher's total lodestar, based on current billing rates, is $322,932.50.  My partner, Scott Bursor, has personally reviewed the time records recorded by me and my colleagues at Bursor & Fisher in this matter.  The time and descriptions displayed in those records were regularly and contemporaneously recorded by me and the other timekeepers of the firm pursuant to firm policy and have been maintained in the computerized records of my firm.  Attached as Exhibit A is a chart showing the time spent, hourly rates and lodestar by timekeeper in this case.

109.    In addition, Bursor & Fisher expended $24,101.91 in out-of-pocket expenses in connection with the prosecution of this case.  Attached as Exhibit B is a chart showing those expenses by category.  Those expenses are reflected in the records of Bursor & Fisher, and were necessary to prosecute this litigation.

110.    Based on my knowledge and experience, the hourly rates charged by my firm are with the range of market rates charged by attorneys of equivalent experience, skill, and expertise. A copy of my firm resume is attached hereto as Exhibit C.

111.    My firm undertook this representation on a wholly contingent basis recognizing that the risk of non-payment has been high throughout this litigation.  There were substantial

uncertainties in the viability of this case as a class action, as well as substantial uncertainties in the merits of the underlying claims. We also faced the risk that another group of plaintiffs might settle the case and we would not obtain any payment for the time we spent on the case. Although we believed the case to be meritorious, a realistic assessment shows that the risks inherent in the resolution of the liability issues, protracted litigation in this action as well as the probable appeals process, are great.

112.    Had we not reached this Settlement with Michaels, we would have vigorously prosecuted the case at trial. We were therefore at great risk for non-payment. In addition, as described above, we have advanced significant expenses that would not have been reimbursed absent a successful result.

## IX.   AN INCENTIVE FEE OF $2,500 TO EACH CLASS REPRESENTATIVE IS APPROPRIATE

113.    After the material matters of the Settlement were agreed upon, Class Counsel also negotiated an agreement that, subject to Court approval, Michaels would pay an incentive award to each of the Class Representatives, namely Mary Allen, Kelly M. Maucieri, Brandi Ramundo, Adrianna Sierra, Fred Sherry, Sara Rosenfeld, Ilana Sofer, Lori Wilson, Jeremy Williams and Kimberly M. Siprut for their efforts in prosecuting these claims on behalf of the Class.

114.    As further detailed in the Declarations of Mr. Vozzolo, ¶ 17 and Mr. Levitt, ¶ 17, Class Counsel consulted with the Class Representatives throughout the investigation, filing, prosecution and settlement of these Actions. Among other things, the Class Representatives were provided with drafts of complaints, pleadings and settlement documents prior to finalization and provided comments and input thereto.

115.    Plaintiffs Kelly Maucieri and Brandi Ramundo, whom I personally represent, were actively involved in the litigation and devoted substantial time and effort to the case. Ms.

Ramundo met with me in person, and they both consulted with me frequently, provided personal financial statements for review, and reviewed a wide variety of documents related to this case including the complaints and Settlement Agreement. Moreover, Plaintiffs Maucieri and Ramundo were prepared to "go the distance" in this litigation to properly represent the class and fight for significant class relief. Through their actions, they hope to confer a significant benefit on tens of thousands of Michaels data breach victims across the country.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed at New York, New York this 22nd day of March, 2013.

                                    _____/s/ Joseph I. Marchese_____
                                         Joseph I. Marchese

# EXHIBIT A

**Exhibit A**

*In re Michaels Stores Pin Pad Litigation*

**BURSOR & FISHER, P.A.**

**TOTAL LODESTAR (at current rates)**

**INCEPTION THROUGH JANUARY 31, 2013**

| TIMEKEEPER | HOURS | RATE | TOTAL |
|---|---|---|---|
| Scott A. Bursor<br>Partner | 93.6 | $850.00 | $79,560.00 |
| L. Timothy Fisher<br>Partner | 0.4 | $680.00 | $272.00 |
| Joseph I. Marchese<br>Partner | 317.1 | $680.00 | $215,628.00 |
| Neal J. Deckant<br>Associate | 33.6 | $375.00 | $12,600.00 |
| Asher B. Bundlie<br>Associate | 32.7 | $375.00 | $12,262.50 |
| Yitzchak Z. Kopel<br>Associate | 5.7 | $300.00 | $1,710.00 |
| Rachel I. Aldous<br>Litigation Support | 5.0 | $180.00 | $900.00 |
| **TOTALS** | **488.1** | | **$322,932.50** |

# EXHIBIT B

**<u>Exhibit B</u>**

*In re Michaels Stores Pin Pad Litigation*

**BURSOR & FISHER, P.A.**

**EXPENSE REPORT**

**INCEPTION THROUGH JANUARY 31, 2013**

| CATEGORY | AMOUNT |
|---|---:|
| | |
| Copying Costs | $359.10 |
| Courier & Overnight Delivery Services | $187.00 |
| Court Filing And *Pro Hac Vice* Fees | $450.00 |
| Litigation Fund | $5,000.00 |
| Miscellaneous | $74.98 |
| Meals | $1,319.85 |
| Air Travel, Lodging & Ground Transportation | $7,994.89 |
| Westlaw, Pacer & Other Research/Consultation Fees | $9,066.09 |
| | |
| **TOTAL EXPENSES** | **$24,451.91** |

# EXHIBIT C

**BURSOR & FISHER**

P.A.

888 SEVENTH AVENUE
NEW YORK, NY 10019

Tel: **212.989.9113**
Fax: **212.989.9163**
**www.bursor.com**

## FIRM RESUME

BURSOR & FISHER lawyers have represented both plaintiffs and defendants in more than 100 lawsuits in state and federal courts throughout the country, primarily in the fields of telecommunications, pharmaceuticals, and dietary supplements.

The lawyers at our firm have an active civil trial practice, having won multi-million dollar verdicts or recoveries in four of four civil jury trials since 2008. In our most recent trial in *Thomas v. Global Vision Products, Inc. (II)*, we obtained a $50 million jury verdict in favor of a certified class of 150,000 purchasers of the Avacor Hair Regrowth System.

The lawyers at our firm have an active class action practice and have won numerous appointments as class counsel to represent millions of class members, including customers of Verizon Wireless, AT&T Wireless, Cingular Wireless, Sprint, T-Mobile, General Electric, Haier America, and Michaels Stores as well as purchasers of Avacor™, Xenadrine™, and Sensa™ products. Since December 2010, Bursor & Fisher lawyers have won appointment as Interim Class Counsel in

i.    *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a putative nationwide class of purchasers of LG French-door refrigerators,

ii.   *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a proposed nationwide class of consumers who made in-store purchases at Michaels using a debit or credit card and had their private financial information stolen as a result,

iii.  *In re Haier Freezer Consumer Litigation* (N.D. Cal. Aug. 17, 2011) to represent a proposed class of people who purchased mislabeled freezers from Haier America Trading, LLC,

iv.   *Loreto v. Coast Cutlery Co.* (D.N.J. Sep. 8, 2011) to represent a proposed nationwide class of consumers who purchased knives or tools made by Coast Cutlery,

v.    *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a proposed nationwide class of military personnel against CitiMortgage for illegal foreclosures,

vi.   *Avram v. Samsung Electronics America, Inc. et al.* (D.N.J. Jan. 3, 2012), to represent a proposed nationwide class of persons who purchased mislabeled refrigerators from Samsung Electronics America, Inc. and Lowe's Companies, Inc.,

vii.  *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012), to represent a proposed nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

viii. *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012), to represent a proposed nationwide class of persons who purchased mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

ix.  *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012), to represent a proposed nationwide class of purchasers of Sensa weight loss products,

x.  *Dei Rossi v. Whirlpool Corp. et al.* (E.D. Cal. Apr. 19, 2012), to represent a proposed nationwide class of persons who purchased mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

xi.  *In re Scotts EZ Seed Litig.* (S.D.N.Y. Sept. 19, 2012), to represent a proposed nationwide class of purchasers of Scotts Turf Builder EZ Seed,

xii.  *Forcellati v. Hyland's Inc.* (C.D.Cal. Nov. 8, 2012) to represent a proposed nationwide class of people who purchased certain Hyland's homeopathic cold and flu remedies,

xiii.  *Routé v. Mead Johnson Nutrition Company* (C.D.Cal. Nov. 11, 2012) to represent a proposed class of purchasers of certain Enfamil baby formula products,

xiv.  *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a proposed nationwide class of purchasers of Sinus Buster products.

The firm has offices in New York, Florida, and California.

## SCOTT A. BURSOR

Mr. Bursor has an active civil trial practice, having won multi-million verdicts or recoveries in four of four civil jury trials since 2008. In Mr. Bursor's most recent trial in *Thomas v. Global Vision Products, Inc.* (II), the jury returned a $50 million verdict in favor of the plaintiff and class represented by Mr. Bursor. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009.

Mr. Bursor graduated from the University of Texas Law School in 1996. He was on the Editorial Board of the Law Review, and was a member of the Board of Advocates and Order of the Coif. Prior to starting his own practice, Mr. Bursor was a litigation associate with Cravath, Swaine & Moore (1996-2000) and Chadbourne & Parke LLP (2001), where he represented large telecommunications, pharmaceutical, and technology companies in commercial litigation.

Mr. Bursor is a member of the state bars of New York, Florida, and California, as well as the bars of the United States Court of Appeals for the Second Circuit, United States Court of Appeals for the Third Circuit, United States Court of Appeals for the Fourth Circuit, United States Court of Appeals for the Sixth Circuit, United States Court of Appeals for the Ninth Circuit, United States Court of Appeals for the Eleventh Circuit, United States District Courts for the Southern and Eastern Districts of New York, United States District Courts for the Northern, Central, Southern and Eastern Districts of California, and the United States District Courts for the Southern and Middle Districts of Florida.

### *Representative Cases*

Mr. Bursor was appointed lead or co-lead class counsel to the largest, 2nd largest, and 3rd largest classes ever certified. Mr. Bursor has represented classes including more than 160

BURSOR & FISHER
P.A.

million class members, roughly 1 of every 2 Americans. Listed below are recent cases that are representative of Mr. Bursor's practice:

Mr. Bursor negotiated and obtained court-approval for two landmark settlements in *Nguyen v. Verizon Wireless* and *Zill v. Sprint Spectrum* (the largest and 2nd largest classes ever certified). These settlements require Verizon and Sprint to open their wireless networks to third-party devices and applications. These settlements are believed to be the most significant legal development affecting the telecommunications industry since 1968, when the FCC's Carterfone decision similarly opened up AT&T's wireline telephone network.

Mr. Bursor was the lead trial lawyer in *Ayyad v. Sprint Spectrum, L.P.* Mr. Bursor represented a class of approximately 1.9 million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. After a five-week combined bench-and-jury trial, the jury returned a verdict in June 2008 and the Court issued a Statement of Decision in December 2008 awarding the plaintiffs $299 million.

Mr. Bursor was the lead trial lawyer in *White v. Cellco Partnership d/b/a Verizon Wireless.* Mr. Bursor represented a class of approximately 1.4 million California consumers who were charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. In July 2008, after Mr. Bursor presented plaintiffs' case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and agreed to an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements.

Mr. Bursor was the lead trial lawyer in *Thomas v. Global Visions Products Inc.* Mr. Bursor represented a class of approximately 150,000 California consumers who had purchased the Avacor® hair regrowth system. In January 2008, after a four-week combined bench-and-jury trial. Mr. Bursor obtained a $37 million verdict for the class, which the Court later increased to $40 million.

Mr. Bursor was appointed class counsel and was elected chair of the Official Creditors' Committee in *In re Nutraquest Inc.*, a Chapter 11 bankruptcy case before Chief Judge Garrett E. Brown, Jr. (D.N.J.) involving 390 ephedra-related personal injury and/or wrongful death claims, two consumer class actions, four enforcement actions by governmental agencies, and multiple adversary proceedings related to the Chapter 11 case. Working closely with counsel for all parties, and with two mediators, Judge Nicholas Politan (Ret.) and Judge Marina Corodemus (Ret.), the committee chaired by Mr. Bursor was able to settle or otherwise resolve every claim and reach a fully consensual Chapter 11 plan of reorganization which Chief Judge Brown approved in late 2006. This settlement included a $12.8 million recovery to a nationwide class of consumers who alleged they were defrauded in connection with the purchase of Xenadrine® dietary supplement products.

## L. TIMOTHY FISHER

Mr. Fisher has an active practice in consumer class actions and complex business litigation and has also successfully handled a large number of civil appeals. Prior to founding Bursor & Fisher, P.A. in 2011, Mr. Fisher was an associate with Bramson, Plutzik, Mahler & Birkhaeuser, LLP in Walnut Creek, California for 13 years. During his career, he has been actively involved in numerous cases that resulted in multi-million dollar recoveries for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and consumer fraud. With his partner Scott A. Bursor, Mr. Fisher has tried four class action jury trials, all of which produced successful results. In the initial phase of *Thomas v. Global Vision Products*, the jury awarded the plaintiff class more than $36 million plus punitive damages, while the Court awarded a $40 million recovery on separate legal claims. In a subsequent phase of the trial against individual defendants, Mr. Fisher and Mr. Bursor obtained a jury award of $50,024,611 -- the largest class action award in California in 2009 and the second-largest jury award of any kind.

Mr. Fisher was admitted to the State Bar of California in 1997. He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern and Eastern Districts of California. Mr. Fisher taught appellate advocacy at John F. Kennedy University School of Law in 2003 and 2004. Recently, Mr. Fisher contributed jury instructions, a verdict form and comments to the consumer protection chapter of Justice Elizabeth A. Baron's *California Civil Jury Instruction Companion Handbook* (West 2010).

Mr. Fisher received his Juris Doctorate from Boalt Hall at the University of California at Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first year moot court competition. In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science. Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council." He is also a member of Phi Beta Kappa.

### *Representative Cases*

- *Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court) - Mr. Fisher litigated claims against Global Vision Products, Inc. and other individuals in connection with the sale and marketing of a purported hair loss remedy known as Avacor. The case lasted more than seven years and involved two trials. The first trial resulted in a verdict for plaintiff and the class in the amount of $40,000,000. The second trial resulted in a jury verdict of $50,024,611, which led to a $30 million settlement for the class.

- *In re Cellphone Termination Fee Cases* - Handset Locking Actions (Alameda County Superior Court). Mr. Fisher actively worked on five coordinated cases challenging the secret locking of cell phone handsets by major wireless carriers to prevent consumers from activating them on competitive carriers' systems. Settlements have been approved in all five cases on terms

that require the cell phone carriers to disclose their handset locks to consumers and to provide unlocking codes nationwide on reasonable terms and conditions. The settlements fundamentally changed the landscape for cell phone consumers regarding the locking and unlocking of cell phone handsets.

- *In re Cellphone Termination Fee Cases* - Early Termination Fee Cases (Alameda County Superior Court and Federal Communications Commission). In separate cases that are a part of the same coordinated litigation as the Handset Locking Cases, Mr. Fisher actively worked on claims challenging the validity under California law of early termination fees imposed by national cell phone carriers. In one of those cases, against Verizon Wireless, a nationwide settlement was reached after three weeks of trial in the amount of $21 million. In a second case, which was tried to verdict, the Court held after trial that the $73 million of flat early termination fees that Sprint had collected from California consumers over an eight-year period were void and unenforceable.

- *Guyette v. Viacom, Inc.* (Alameda County Superior Court) - Mr. Fisher was co-counsel for a class of cable television subscribers who alleged that the defendant had improperly failed to share certain tax refunds with its subscribers. A settlement was negotiated shortly before trial under which defendants paid the class $13 million in cash and paid for all expenses of notice to the class and settlement administration.

### *Selected Published Decisions*

- *In re Cellphone Termination Fee Cases*, 186 Cal.App.4th 1380 (2010)

- *In re Cellphone Termination Fee Cases*, 180 Cal.App.4th 1110 (2009)

- *Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007)

### JOSEPH I. MARCHESE

Mr. Marchese is a Partner with Bursor & Fisher, P.A. Mr. Marchese focuses his practice on complex business litigation and consumer class actions. Prior to joining Bursor & Fisher, Mr. Marchese was a litigation associate with DLA Piper and Shearman & Sterling where he represented investment banks, pharmaceutical companies, insurance carriers, food manufacturers, and tobacco companies.

Mr. Marchese is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York.

Mr. Marchese graduated from Boston University School of Law in 2002 where he was a Member of The Public Interest Law Journal. In 1998, Mr. Marchese graduated with honors from Bucknell University where he earned a B.S.B.A.

### *Selected Published Decisions*

- *In re Michaels Stores Pin Pad Litigation*, No. 11 C 3350, 2011 U.S. Dist. LEXIS 135284 (N.D. Ill. Nov. 23, 2011)

## SARAH N. WESTCOT

Sarah N. Westcot is an Associate with Bursor & Fisher, P.A. Ms. Westcot focuses her practice on complex business litigation and consumer class actions. Prior to joining Bursor & Fisher, Ms. Westcot litigated civil actions as an attorney with Bay Area Legal Aid in San Jose, CA.

Ms. Westcot is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California.

Ms. Westcot received her Juris Doctorate from the University of Notre Dame Law School in 2009. During her third year of law school, Ms. Westcot worked as a law clerk with the local public defender's office representing juvenile clients in criminal hearings. She graduated with honors from the University of Florida in 2005.

## NEAL J. DECKANT

Neal J. Deckant is an Associate with Bursor & Fisher, P.A. Mr. Deckant focuses his practice on complex business litigation and consumer class actions. Prior to joining Bursor & Fisher, Mr. Deckant counseled low-income homeowners facing foreclosure in East Boston.

Mr. Deckant is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York.

Mr. Deckant received his Juris Doctorate from Boston University School of Law in 2011, graduating *cum laude* with two Dean's Awards. During law school, Mr. Deckant served as a Senior Articles Editor for the Review of Banking and Financial Law, where he authored two published articles about securitization reforms. In 2007, Mr. Deckant graduated with Honors from Brown University with a B.A. in East Asian Studies and Philosophy.

## YITZCHAK KOPEL

Yitzchak Kopel is an Associate with Bursor & Fisher, P.A. Mr. Kopel focuses his practice on complex business litigation and consumer class actions.

Mr. Kopel is admitted to the State Bar of New Jersey and is a member of the bar of the United States District Court for the District of New Jersey.

Mr. Kopel received his Juris Doctorate from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards. During law school, Mr. Kopel served as an Articles Editor for

BURSOR&FISHER
P.A.

the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling. In 2009, Mr. Kopel graduated *cum laude* from Queens College with a B.A. in Accounting.